Good morning, Your Honors. May it please the Court, my name is Brooks Holland, counsel for Jesus Valencia. With the Court's permission, seated at counsel's table is Michelle Trombley. She's a law student at Gonzaga University who assisted me on the brief. Your Honor, Mr. Valencia appeals the judgment of the District Court convicting him after a jury trial of possession of marijuana with intent to distribute and possession of a firearm as an illegal alien. Mr. Valencia raises three principal claims on appeal. First, the District Court erred in denying his motion to suppress physical evidence recovered from the Maple Crest residence here in Washington State. The physical evidence included the charged firearm as well as the charged marijuana. It also included three additional firearms as well as other physical evidence including a red pickup truck that was featured prominently in the government's case. The District Court incorrectly concluded that Mr. Valencia voluntarily consented to the full scope of the search that produced this physical evidence. Second, the District Court abused its discretion in its non-answer, as the District Court itself characterized it, to the deliberating jury's written request for clarification of the term intention in jury instruction number 17. Instruction 17 defined constructive possession for the jury, and possession was the central issue in this trial. Third, the District Court erred when it assessed two points under sentencing guideline 2K2.1 to Mr. Valencia's total guidelines calculation on the theory that Mr. Valencia unlawfully possessed three or more firearms in the Maple Crest residence. The motion to suppress, Your Honor, centered around consent issues, and the government's theory of consent for the warrantless search of the Maple Crest residence raises issues both of voluntariness of the consent that was proffered as well as scope of consent in the degree of search that followed the alleged instances of consent. Based on the briefs, it may be effective to separate the two instances of allegedly expressed consent by Mr. Valencia during the search of the Maple Crest residence, first at the front door preceding the search, a second instance in the living room of the residence while the search was underway. By contrast, the record evidence establishes no expressed consent by Mr. Valencia to the search of the garage, contrary to the apparent argument of the government in its brief on pages 10 and 36-37, where the government argues that while in the living room, Mr. Valencia consented to a continued search of the residence as well as the garage. The record cites, which are to pages 41-42 in the government's brief as well as page 71, contain no testimony of consent by Mr. Valencia. How about giving him the keys? Well, correct, Your Honor. That is what the testimony established. Agent Dye testified that he wanted consent to search the garage because he determined that it was locked along with another area. Agent Dye couldn't testify whether Mr. Valencia consented because Agent Dye does not speak Spanish. So before the hearing, he checked with the two Spanish-speaking officers who had spoken with Mr. Valencia and asked them whether he consented to a search of the garage. And those agents said that they could not recall asking Mr. Valencia for permission to search the garage. All they could recall is that at some point subsequent to Mr. Valencia being in handcuffs and refusing to sign a written consent form in the living room and the search of the locked garage, he produced keys to the garage. Now, of course, those keys did not work on the lock to the garage, so the police unilaterally, without further permission, obtained a pry bar and broke the lock off the garage. So I suggested that we separate the garage from the house because I would suggest that the issues of and substantial issues concerning the lawfulness of the seizure of the two items there, the .22 caliber firearm and the red pickup truck. If it was error to seize that firearm and that truck, does that wipe out the conviction? Is that a material error for the conviction assuming that the firearm is not can be counted as an enhancement? Well, the suppression order actually under this circuit's authority would not affect the admissibility of that evidence at sentencing under the sentencing guidelines. As to the conviction, since this evidence was admitted at trial during the government's case, this error would be subject to harmless error review, but the government would bear the burden of proving beyond a reasonable doubt that this error did not prejudice the conviction. What they found in the house was the three duffel bags of marijuana and one handgun, right? They found three firearms in the house, the one handgun in a bedroom downstairs across from the bedroom where they located the marijuana. You're distinguishing the bedrooms from the house? No, they found three total firearms in the house. I'm following up on Judge Gold's question. I don't see how the conviction would stand if we granted the motion, if we reversed the denial of the motion to suppress because that was all the evidence of possession with intent to distribute and the 924C count, right? Correct. It was probably the central evidence, so the conviction wouldn't stand if we couldn't find this harmless. I don't think there's any way we could find harmless if we thought that the search was not consented to. Correct, and certainly if the court grants the defense argument that the motion should have been granted by the district court in its entirety or at least as My question was really addressing, assuming it was okay to come in and search the house generally, but not okay to search the garage and not okay to seize or offer evidence of the gun that was in the garage or the pickup, would that error alone officiate a partial suppression order? Would that officiate the conviction? I would submit not, Your Honor, particularly because of the role that the red pickup truck played during the government's trial. The government presented evidence repeatedly of the connection between that pickup truck that was seized from the garage. In particular, the government presented evidence of Mr. Valencia in photographs recovered from a closet in one of the bedrooms in the residence, showing him with the red pickup truck that was seized from the garage. The government even introduced evidence that counsel for Mr. Valencia had submitted a forfeiture claim form indicating ownership of the red pickup truck by Mr. Valencia. Refresh my memory in this case, though. It's Friday. We've had a long week. The red pickup truck, what role did it play in the two counts of conviction? The role I understood it to play, Your Honor, was connecting Mr. Valencia to control over the residence in a way that established beyond a reasonable doubt his dominion and control over the two charged pieces of evidence, the duffel bags of marijuana and the firearm. They were recovered from different bedrooms in the residence, one of which the government attempted to prove was a bedroom that Mr. Valencia used for himself because of some personal belongings there. That was the bedroom that contained the firearm. The marijuana was recovered in a bedroom across the hall from that bedroom. As the jury's request about the jury instruction number 17 indicates, constructive possession was the central issue, or whether Mr. Valencia exercised enough dominion and control over the entirety of the residence that he could be said to possess those two items that he did not personally possess at the time they were seized. There was evidence that the house was used by multiple other individuals. Right. Beyond the voluntariness issues, Your Honor, we also have scope of consent issues. At the front door, the police secured what the government contends was voluntary consent with Mr. Valencia after a total of 17 words exchanged between him and the officers according to the testimony. Do you live here? Yes. Is it okay if we search the house? It's fine. Mr. Valencia steps aside and the officers enter immediately with Agent Dye at the lead. Agent Dye proceeded not just to search the general common areas of the house, which is how he initially discovered the duffel bags of marijuana. He observed them through an open bedroom door in the hallway. He then, without any further consent or permission from Mr. Valencia, proceeded to search a closet in an adjoining He then went upstairs to a second bedroom, a converted attic bedroom, where Agent Dye found the shotgun and ammunition. This was all based on initial consent at the front door that amounted to a mere few seconds of exchange between unknown and unexpected officers and Mr. Valencia, where Mr. Valencia simply said, it's fine. Okay, so was the scope of consent issue raised to the district court? Yes, it was. The government is contending waiver on the ground that this wasn't preserved. Mr. Valencia moved to suppress all of the evidence that was the subject of the hearing, and that includes the evidence that's covered by the scope of consent claim. And in the memorandum submitted in support of the motion to suppress, and this appears on page 4 of the supplemental excerpts of record, Mr. Valencia articulated scope of consent explicitly as a theory for suppression and challenging the government's claim to consent. Mr. Valencia said that consent to be successful requires the government to prove voluntariness, authority, and that the search remained within the scope of consent given. So this issue was explicitly preserved in the papers. I don't know whether they qualified as a pleading for the motion to suppress, but for the papers submitted in support of the motion to suppress. And then at the hearing, the government presented evidence covering all of the scope of consent claims. So on appeal, they really can articulate no prejudice in their ability to litigate. So I would submit, Your Honor, that this case falls under the Lemons case that I submitted in my reply brief and was preserved. So what would tell the, what statements by Mr. Valencia would inform the police that when he was saying it's fine, it was limited to areas, not the bedrooms? As the Supreme Court has said, the test is one of objective reasonableness. What would a reasonable person understand from an exchange? Right. And so what was there that would indicate that there was a limited scope of consent? The problem in this case is there was nothing that was expressed, and the Supreme Court in the Jimeno case said that typically the scope of consent would be defined by its expressed object. And in many of these cases, including the authorities submitted by the government, the investigating officers will indicate we're looking for drugs or we're looking for weapons. That will indicate to the person giving consent the reasonable scope that could be expected. Here, it was simply a general search. Well, typically with a house, there's a warrant which identifies what they're looking for. But here, outside the house, Mr. Valencia said they could come in. Correct. I would submit that the scope of consent jurisprudence attempts to maintain some harmony between consent as an exception to the otherwise applicable warrant requirement and the particularity requirement of the warrant clause in the Fourth Amendment. What we shouldn't try to do is allow or define the exception to the warrant requirement to reward ambiguity or lack of information by enlarging police authority when they do not identify the object of their search and do not give the homeowner any indication of how far the search will go. By saying less, the agents would be able to enlarge their authority or put the burden on the homeowner to delineate the borders to the consent given. The police simply asked, may we search? Mr. Valencia said it's fine and stepped aside. Absent more in a house that's a multi-unit, multi-occupant, multi-story dwelling, the police should be limited to those areas where a reasonable person would expect a general invitation to permit the police. Not into upper shelves of personal bedroom closets. Not into photograph collections. Not into upstairs bedrooms. But Agent Dye testified, appeared to him to belong to people other than the person who had given consent to the front door. Which is why in the brief I suggested this issue also could be understood potentially as an apparent authority problem. Okay, why don't you reserve a couple minutes. I will, thank you very much. Thank you. You're not waiving any argument by not raising it. Good morning and may it please the Court. Michael Scoville appearing on behalf of the United States. I'd like to start by addressing the question about the scope of consent. And I think the question raised by Judge Wardlaw is an excellent one about whether any indication was given to the officers that their scope was limited. And I think the record clearly speaks and also Judge Layton's findings clearly speak to the fact that there wasn't a limitation given on the scope of consent. The encounter was the officers approached the house. Mr. Valencia Rivelta had stepped to the doorway. And they asked him first, do you live here? He said yes in Spanish. Then they asked him, may we search the house? And he said, esta bien, it's fine. And he stepped aside indicating that they had permission to enter the house. So he consented to it. Would that mean that that consent would let them look in every closet, open up every box, search in every cookie jar? Your Honor, I'd suggest it would. It is a broad scope of consent. May we search the house? The house encompasses the bedrooms. It encompasses the things within the bedrooms. Did the police officers use the word the house specifically? That's what the record reflects. I don't think the record actually established what Spanish words were used. We should know that since we're relying on consent given in Spanish. We should know exactly what words were used. The agent testified in English about his conversation. He said that I requested permission to search the house. And he said, esta bien. So the record reflects that he said in Spanish, esta bien, it's fine. It doesn't clearly reflect exactly what Spanish the officer used in order to elicit that response. But the officer testified that he said house. And that's what Judge Layton found. Okay. Does the house include the garage? That is a more difficult question. I would submit that first, that issue wasn't squarely raised to the district court. And I'd point the court in particular to the supplemental pleading that the defense filed after the evidence you're hearing on the motion to suppress. Because Judge Layton then requested supplemental briefs to be submitted by the parties. The defense said not a word about delimitation of the garage from the rest of the house, even though testimony had been elicited at the suppression hearing about all the things that were found. Furthermore, at the suppression hearing, when the counsel for the government attempted to elicit more specifically when things were found in sequence, counsel for the defendant objected and said that's really not within the scope of what we're doing here, Your Honor. So defense counsel, in a sense, didn't present that issue to the district court. And also through the objections to the scope of the suppression hearing, hamstrung the district court's ability to make specific findings regarding the scope of the consent. So for those reasons, we don't think that that issue is squarely presented to this court. Should the court choose to address it, however, I would suggest that there are two important considerations here. One is that when the agents wanted to search the garage, they had to go back to Mr. Valencia-Riavelta because they had to get keys.  And as Judge Ware pointed out, Mr. Valencia-Riavelta showed them where keys were located. True, the keys didn't work, but showing them where the keys were located does not amount to a refusal to allow them to search the garage and implies that he consented to extend the scope of the search to the garage, even to the extent that wasn't initially part of the consent to search that was granted. Right. The part that bothers me is that there's another implication there, which is if, you know, we know there's multiple dwellers and if Mr. Valencia's keys to the garage didn't work, was he the person who was entitled to give consent to the search of the garage? Because obviously he couldn't get into it. So that would be an objective indicator that they got the wrong person consenting. That's an excellent point. Cutting the other way, though, is the fact that Mr. Valencia-Riavelta did claim ownership of the red Nissan pickup truck that was found inside the garage, which would seem to suggest that he did have access. Right, but don't we look at what the objective facts the officers reasonably relied on at the time of conducting the search? Yes, Your Honor. So at the time, he had keys, but they didn't work. So doesn't that tell the officers maybe they... Well, okay, so that's a problematic issue for me. But beyond that, suppose, as Judge Gold suggested, that the fruits of the search of the garage should have been suppressed. What's the result? How does that affect the conviction? Maybe you have to have a retrial, but you still bring in the three duffel bags, the other guns. I would suggest that a retrial is not necessary because to the extent the court finds that the search of the garage was invalid, the error in that would be harmless for two reasons. First, Mr. Valencia-Riavelta was not charged with possessing the firearm, the .22 caliber rifle, that was found in the garage. He was charged only with possessing the .38 caliber handgun that was found in the downstairs bedroom and that he admitted was his. Second, there were many admissions by Mr. Valencia-Riavelta which came into evidence connecting him to the house.  When the agents first approached the house and asked him if he lived there, he said he did. He also had his passport and identification in the same downstairs bedroom in which the .38 caliber handgun were found and his gold chain was found in the house and photographs of him were found in the house. So I would suggest that the evidence linking the defendant to the red Nissan pickup truck was not necessary to secure the conviction and I do not believe that if that evidence had been suppressed, there would have been a different outcome at trial. How was it used? How was the red truck used? The red truck was used at trial. It was used as a cumulative piece of evidence among many others to connect the defendant to the house. To connect him to the house? Yes. Okay, but you're saying you had overwhelming evidence that basically through his admissions that he lived there. Yes, most primarily the fact that he was there when they came and his admissions that he lived there. And also he himself in his case introduced evidence that he and his family had identification cards with the address of that house printed on them. So to the extent that the government's own case in chief wasn't sufficient to establish that, the defendant was helpful in that regard by introducing further evidence that connected him to the house during the defense case at trial. But for certain you wouldn't be entitled to the two-level enhancement for the possession of between three and seven if that evidence were? Your Honor, we would still have three firearms because there were three firearms recovered within the house, even if the firearm recovered within the garage had been excluded. While we're talking about that, let me just have you focus on it. Assuming for sake of argument that the conviction stands, how can we think that for sure all three firearms in the house were his firearms that he possessed? When other people lived in the house. I understand the one in the house, he said, that's my gun. But what about the other guns that are found in the bedroom upstairs where it looks like some other people are living there? Well, Your Honor, more than one person can have constructive possession of firearms if the people all have dominion and control and the power and intention to control the firearms. And I would suggest that the record before the trial judge, which included the record of the entire trial and also the findings in the PSR, which the court adopted, clearly did establish by preponderance of the evidence that Mr. Valencia-Raybelta had constructive possession of all three of the firearms that were found in the house at the very least. The .38 caliber handgun, as Your Honor notes, the defendant admitted essentially possessing. The other two firearms, the defendant didn't deny that he knew they were there. And in fact, the shotgun that was found upstairs was leaning up against the staircase and all the firearms were loaded. So the two that were found in the converted bedroom, that converted bedroom wasn't where you contended it was his bedroom, right? The downstairs bedroom appeared to be Mr. Valencia-Raybelta's bedroom. Right. So the converted bedroom where the other two were found appeared to be someone else's bedroom. Yes, Your Honor. It was unclear exactly who was living there. Let's say Billy the Kid lived there and he wears a gun on his hip all the time. And Mr. Valencia-Raybelta knows that Billy the Kid packs a gun and lives in his room up there. Does he possess that gun? If the gun's always with Billy the Kid, I don't think anyone would want to try to take that gun away from Billy the Kid. Right. So he doesn't possess it. Probably not. But here those guns were left unattended. The shotgun was leaning up against the staircase, suggesting that it was put there for anyone in the house who happened to have to defend it against somebody who's trying to steal the drugs from the house or the cash from the house will have ready access to it. So I think the fact that all the guns were loaded, none of them were on the hip of any person, Mr. Valencia-Raybelta was the only guy inside the house. Where was the third gun? We got the gun he admitted to, the shotgun that you think was readily available to anybody. And where was the third gun? The third gun was deeper into the attic bedroom. I think it was in the closet, if I'm not mistaken. And so certainly the circumstances surrounding the shotgun are more favorable towards the constructive possession case. But the government would submit that there was still adequate evidence in the record for the court to make in the context of the sentencing proceeding the finding that even that handgun was in the constructive possession and control of Mr. Valencia-Raybelta. This notion of constructive possession is not the language that we use, but you're talking about multiple people having possession. And possession has two ways of being defined, as the court instructed the jury. One, physical possession, and that wasn't the case in any of the weapons. The other is knowing presence and power and intention to control. So you've spoken to the power, because I guess your argument is because they were loose and available, anyone could have the power to control them. But how about the question that the jury asked, what does it mean to have the power and the intention to control? Doesn't that require a mental element that the jury was crying out for? How do we know whether someone intends to control something that's not in their physical possession? Intention certainly does require a mental element, Your Honor. And to the extent that the court is now shifting from the sentencing question to the jury instruction question, the second question presented, I'd note for the record that I think it's very interesting that after the jury raised the question, both the defense counsel and the government counsel and the court conferred, and they had a discussion about how to instruct the jury. The defense proposed that the court instruct the jury that intention requires essentially an element of willfulness, that you intend to commit a crime. That would have been contrary to Ninth Circuit precedent in case law. And even Mr. Holland's now in appeals, not submit that that would have been a correct instruction to give to the jury. So the only other instruction that was offered to give to the jury would have been to instruct them that intention has its common meaning. But then the defense objected and said, we don't want that instruction. If the court's not going to give the instruction that essentially boils down to a willfulness instruction, we don't want any instruction at all, and we'd like you to refer them back to their previous instruction. So the government would suggest that what the court did, especially given defense counsel's actions in the context of that colloquy, was not an abuse of discretion. Well, but the judge's duty goes beyond what the lawyers ask the judge to do. The question of instructions are questions of law for the judge to decide. And so is your position that the court had no responsibility to respond to the jury question, given the position taken by the parties? No, Your Honor. Our position is that first the instructions had already adequately defined the term intention for the jury. They defined possession, but had they defined intention? I'm sorry, you're right. The instructions had already adequately defined the element of possession. The word intention is not an element. It's one of the words used within the possession instruction. And so the court proposed to the defense counsel, I'll define the term intention by referring jurors to its common meaning, and then the defense counsel said, no, we don't want that instruction. That would have been probably the best and most correct instruction that the district court could have given at that point in time, and the defense blocked the district court from giving that further elucidation. Well, he objected to that. He preferred the Washington State Code definition of the word intention. What was wrong with that? The problem with that instruction, Your Honor, is that it would have, it refers to intention to do something unlawful, intention to commit a crime, which in turn requires that you prove that the person who is charged knows that they're under some legal duty not to commit that act. And that is not the way that the instructions from this circuit regarding possession of a firearm by an illegal alien have been construed to mean. In other words, just as with possession of firearms and with possession of drugs, you don't have to know that there's a law that forbids you from possessing a firearm. You don't have to know that there's a law that forbids you from possessing drugs. You just have to know that you possess drugs. Well, no, I agree that there's a good question as to whether the Washington criminal instruction applies, because it talks about acts. It's not talking about intention here. The intention that is the focus of the jury's instruction was a mental element, not an action. Right. You didn't have to do anything. You had to have a certain mental state. And so how was the jury to determine the mental state based on this evidence and the definition of intention? The jury was left with the instruction, which if I may just find it. You're talking instruction number 17? Yes, instruction number 17. There was no definition of intention given. It was mentioned, but that became the problem, didn't it? Right. So instruction number 17 says the person has possession of something. The person knows of its presence, has physical control of it, or knows of its presence, and has the power and intention to control it. I'd submit that the most likely inference from the fact that the district court did not instruct the jury further after the question is that the jury was left with the common understanding of intention. Which is what? Will. Desire. To control it. And here there was sufficient evidence that Mr. Valencia-Riovalta had that type of mental state, both because of the presence of the drugs in the house and the connection between drugs and gun possession, and also because of Mr. Valencia-Riovalta's admission, which was also introduced into evidence, that he possessed the firearm that had been given to him by a friend whose name he couldn't recall a couple months earlier. And I wish I had brought up this point earlier. I think his admission regarding that the .380 caliber firearm was his was also a crucial point for the jury. Did he admit knowing that the other weapons were there? He did not admit that. But then again, that wasn't a question that the jury had to consider with respect to convicting on the count of possessing a firearm as an illegal alien, because he was only charged in that count with possessing the .380 caliber handgun. All right. Thank you, Counsel. You've gone well over your time, and you have similar battle time. Thank you, Your Honors. First, let me clarify the location of the 9mm handgun that was recovered from the upstairs converted attic bedroom in addition to the 12-gauge shotgun. It was recovered from a duffel bag inside that room, and Agent Dye testified that the duffel bag appeared to belong to individuals other than Mr. Valencia. You can find these references on page 59 and around pages 151 and 181 of the record. So it was in a duffel bag within the bedroom in contrast to the shotgun, which was found at the top of the stairs along with ammunition leading into the converted attic bedroom. Your Honors, I think the questions we're exploring about constructive possession in addressing issues of harmless error in the sentencing judgment under the guidelines of the district court really highlight the trouble of the district court's decision not to clarify the meaning of intention to the jury when it twice requested clarification of that term. It asked for clarification of the term intent. The district court was not sure whether that referred to instruction 16 or 17, so the court responded in writing, and the jury made quite clear, no, we need intention in instruction number 17 dealing with possession. Please clarify. After entertaining arguments from counsel, the district court gave a non-answer as it characterized it. The trouble with the government's proposed instruction is that in referring to ordinary understandings, we're really offering no definition or potentially a definition that takes the jury in the wrong direction in thinking about intention. It is a mental state, and it's a mental state that is subjective in nature. An ordinary could potentially lead the jury to believe that this is some sort of reference to an objective standard, one of the ordinary or reasonable person in thinking about goals or an act of possession. The Washington instruction, I acknowledge, was not perfectly tailored to the possession issue in this case. It seemed to address a result element type of crime, but it did speak to the core feature of intent that the jury needed to know in this case, that it involved the subjective mental state to Mr. Valencia, and it was one of purpose or conscious object, not something objective or external to him or something that ordinary people would believe or expect under the circumstances of guns being in particular places. You can look at the Lane case and the McCall cases cited in the briefs as an example of the type of instruction that would get right to that point. In those cases, the juries already had been instructed about intent, meaning a specific purpose to deceive according to the charges in those cases, and that's why this court upheld the district court's decision not to instruct the jury further, because really they were just asking for help on how to apply that definition to the facts of the case. Here, the jury was asking for a basic legal definition of intention, and the jury did not receive one of any kind from the court, let alone one of concrete accuracy. Well, the defense counsel didn't want him to give the ordinary definition, and the only offer he made was the one that everyone seems to agree is inappropriate. So what was the court to do? The court was obliged at that point, I would submit, Your Honor, to fashion an instruction that answered the jury's question with concrete accuracy. That's the standard in this circuit. A modification of the Washington standard certainly may have been reasonable and not an abuse of discretion if it got to the central point that intention means something involving an objective or a purpose that's prohibited under the charge that's being presented here, possession. Ordinary, in no way under this court's authority, speaks to the mental state of intention. And would that be reviewed for harmless error also, or not? Is that structural error? The standard review would be abuse of discretion on the merits of the court's ruling. If this court determined that the judge did abuse his discretion, then the government would have to prove harmless error beyond a reasonable doubt, and that's the standard used in the Warren case. Okay. Thank you very much, Your Honor. Thank you, counsel. And I do want to commend you for including your law student in the argument today. Very nice. Thank you. Briefs were excellent. Okay. United States v. Valencia is submitted, and the court will be in recess for a few minutes before we take up the human life of Washington v. Bremsicle case. All rise.
judges: Ware, Wardlaw, Gould